**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| FIRST BIOTECH INC.,<br>*Plaintiff*,<br>v.<br>UNITED STATES,<br>*Defendant*. | Court No. 26-03249 |

**PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff First Biotech Inc. respectfully moves for judgment on the administrative record. For the reasons set forth in the accompanying Memorandum of Law in support of its motion, Plaintiff requests that this Court find that U.S. Customs and Border Protection's ("CBP") Office of Regulations and Rulings Final Administrative Review Determination in Enforce and Protect Act Consolidated Case Number 8144, issued on July 7, 2026 under 19 U.S.C. § 1517(f), and CBP's Trade Remedy & Law Enforcement Directorate Notice of Determination as to Evasion issued on February 26, 2026, under 19 U.S.C. § 1517(c), holding that Plaintiff evaded the antidumping duty order on Xanthan Gum from the People's Republic of China, are arbitrary, capricious, an abuse of discretion, not supported by substantial evidence on the record, and otherwise not in accordance with the law.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

*/s/ Ned H. Marshak*
Ned H. Marshak
Sarah E. Raymond

599 Lexington Ave, 36th Floor
New York, New York 10022
(212) 557-4000

Dated: November 6, 2026

*Counsel for Plaintiff First Biotech Inc.*

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

FIRST BIOTECH INC.,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*.

Court No. 26-03249

**PUBLIC VERSION**

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

Ned H. Marshak
Sarah E. Raymond

599 Lexington Ave, 36th Floor
New York, New York 10022
(212) 557-4000

*Counsel for First Biotech Inc.*

Dated: November 6, 2026

# TABLE OF CONTENTS


I. STATEMENT PURSUANT TO RULE 56.2 .......... 1

A. Administrative Decisions Under Appeal .......... 1

B. Reasons for Contesting the Administrative Decisions .......... 2

C. Issues Presented .......... 2

II. PRELIMINARY STATEMENT .......... 2

III. JURISDICTION .......... 6

IV. STANDARD OF REVIEW .......... 6

V. STATEMENT OF FACTS .......... 9

A. The ADD Order and Commerce's Administrative Reviews .......... 9

B. Plaintiff .......... 11

C. The Transactions Between Neimenggu Fufeng and First Biotech .......... 11

D. CP Kelco's Allegation and the Initiation of EAPA Consol. Case 8144 .......... 13

E. Development of the Administrative Record .......... 14

F. The TRLED Determination .......... 16

G. CBP Headquarters RR Determination .......... 17

H. Judicial Review .......... 20

VI. SUMMARY OF ARGUMENT .......... 20

VII. ARGUMENT .......... 23

A. The Governing Legal Standard .......... 23

B. Substantial Evidence Does Not Support CBP's Finding That the Neimenggu Fufeng to First Biotech Transactions Were Not *Bona Fide* Sales .......... 28

C. CBP's Determinations as to Deosen USA and First Biotech Are Not Consistent .......... 36

D. CBP Made the *Bona Fide* Sale Issue Dispositive After the Record Closed .......... 37

E. CBP Did Not Perform the All Costs Plus a Profit Analysis .......... 39

F. Transaction Value Cannot Be Based on First Biotech's Domestic Resale Prices to Its Unaffiliated Customers in the United States .......... 42

VIII. CONCLUSION .......... 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Enf't Comm. v. United States*,
578 F. Supp. 3d 1310 (CIT 2022) ....................4

*Ad Hoc Shrimp Trade Enf't Comm. v. United States*,
632 F. Supp. 3d 1369 (CIT 2023) ....................32

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) ....................8, 32, 38

*Changzhou Wujin Fine Chemical Factory Co. v. United States*,
701 F.3d 1367 (Fed. Cir. 2012) ....................7

*Dickinson v. Zurko*,
527 U.S. 150 (1999) ....................8

*Dongbu Steel Co. v. United States*,
635 F.3d 1363 (Fed. Cir. 2011) ....................36

*J.L. Wood v. United States*,
505 F.2d 1400 (1974) ....................3, 26, 27, 30

*Jinfu Trading Co. v. United States*,
31 CIT 996 (2007) ....................39

*Jinko Solar Imp. & Exp. Co. v. United States*,
701 F. Supp. 3d 1367 (CIT 2024) ....................4

*LA Molisana S.p.A. v. United States*,
138 F.4th 1353 (Fed. Cir. 2025) ....................36

*Leco Supply, Inc. v. United States*,
619 F. Supp. 3d 1287 (CIT 2023) ....................6

*Loper Bright Enterprises. v. Raimondo*,
603 U.S. 369 (2024) ....................7, 23, 33

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ....................42

*Meyer Corp., U.S. v. United States*,
43 F.4th 1325 (Fed. Cir. 2022) ....................25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)........................................................................................8, 32, 42

*Neimenggu Fufeng v. United States*,
Court No. 26-03423, Complaint (July 29, 2026)........................................................10

*NSK Ltd. v. United States*,
115 F.3d 965 (Fed. Cir. 1997)...................................................................................26

*Rodale Press, Inc. v. FTC*,
407 F.2d 1252 (D.C. Cir. 1968)..................................................................................38

*Royal Brush Mfg., Inc. v. United States*,
483 F. Supp. 3d 1294 (CIT 2020)..................................................................................8

*Royal Brush Mfg., Inc. v. United States*,
75 F.4th 1250 (Fed. Cir. 2023)................................................................................9, 38

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947).....................................................................................4, 21, 44

*SKF USA Inc. v. United States*,
254 F.3d 1022 (Fed. Cir. 2001).....................................................................................7

*SKF USA Inc. v. United States*,
263 F.3d 1369 (Fed. Cir. 2001).........................................................................22, 36, 42

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)..................................................................................................33

*Superior Com. Sols., LLC v. United States*,
811 F. Supp. 3d 1363 (CIT 2025)................................................................................38

*Transactive Corp. v. United States*,
91 F.3d 232 (D.C. Cir. 1996)......................................................................................36

*Tube Forgings of Am., Inc. v. United States*,
750 F. Supp. 3d 1364 (CIT 2025)................................................................................36

*United States v. Mead Corp.*,
533 U.S. 218 (2001)...........................................................................................23, 33

*Ventura Coastal, LLC v. United States*,
736 F. Supp. 3d 1342 (CIT 2024)..................................................................................7

*VWP of America, Inc. v. United States*,
175 F.3d 1327 (Fed. Cir. 1999)............................................................................*passim*

*VWP of America, Inc. v. United States*,
980 F. Supp. 1280 (CIT 1997) ........................................................................24

*Water Quality Ins. Syndicate v. United States*,
225 F. Supp. 3d 41 (D.D.C. 2016) ........................................................................8

*WelCom Prods., Inc. v. United States*,
865 F. Supp. 2d 1340 (CIT 2012) ........................................................................8

*Wheatland Tube Co. v. United States*,
161 F.3d 1365 (Fed. Cir. 1998)........................................................................8

**Regulations**

19 C.F.R. § 152.103 ........................................................................ *passim*

19 C.F.R. § 165.23 ........................................................................16, 22, 38

19 C.F.R. § 165.26 ........................................................................16

19 C.F.R. § 165.27 ........................................................................39

19 C.F.R. § 165.41 ........................................................................17

19 C.F.R. § 177.9 ........................................................................33, 34

**Rules**

CIT Rule 56.2........................................................................1

**Statutes**

5 U.S.C. § 706........................................................................7

19 U.S.C. § 1401 ........................................................................ *passim*

19 U.S.C. § 1517........................................................................ *passim*

19 U.S.C. § 1677........................................................................7, 9

28 U.S.C. § 1581 ........................................................................6

**Administrative Decisions**

*Xanthan Gum from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*,
78 Fed. Reg. 43,143 (July 19, 2013)........................................................................ *passim*

*Xanthan Gum from the People's Republic of China: Notice of Third Amended Final Determination*, 85 Fed. Reg. 40,967 (July 8, 2020)........................................................................9

*Xanthan Gum from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Partial Rescission of the Antidumping Duty Administrative Review, and Final Determination of No Shipments; 2021-2022*, 89 Fed. Reg. 8,165 (Feb. 6, 2024) ....................9

*Xanthan Gum from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments*, 90 Fed. Reg. 22,240, 22,242 (May 27, 2025) ....................9, 10

*Xanthan Gum from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2023-2024*, 91 Fed. Reg. 43,610 (July 16, 2026) ....................10

**CBP Rulings**

HQ 544658 (Mar. 26, 1991) ....................27

HQ 544659 (July 3, 1991) ....................28

HQ 544745 (Feb. 19, 1992) ....................35

HQ 545705 (Jan. 27, 1995) ....................32

HQ 546998 (Jan. 19, 2000) ....................40

HQ 548239 (June 5, 2003) ....................26

HQ H037375 (Dec. 11, 2009) ....................40

HQ H106603 (July 25, 2011) ....................40

HQ H218759 (July 9, 2012) ....................28

HQ H283094 (Aug. 15, 2023) ....................27

HQ H310087 (Mar. 18, 2022) ....................25, 31, 32

HQ H322425 (Aug. 15, 2025) ....................26

HQ H343362 (May 6, 2025) ....................18, 19, 33, 34

**Other Authorities**

CBP, *What Every Member of the Trade Community Should Know About: Bona Fide Sales and Sales for Exportation to the United States* (Aug. 2005) ....................31

Uniform Commercial Code, Article 2 ....................27, 28

Plaintiff First Biotech Inc. ("First Biotech") submits this Memorandum of Law to support its Rule 56.2 Motion for Judgment on the Agency Record.[1]

## I. STATEMENT PURSUANT TO RULE 56.2

### A. Administrative Decisions Under Appeal

First Biotech, an importer of xanthan gum from its affiliate, Neimenggu Fufeng Biotechnologies Co., Ltd. ("Neimenggu Fufeng"), seeks judicial review of U.S. Customs and Border Protection ("CBP" or Customs"), Office of Regulations and Rulings ("RR"), Final Administrative Review Determination ("RR Determination") in Enforce and Protect Act ("EAPA") Consolidated Case Number 8144, issued on July 7, 2026, under 19 U.S.C. § 1517(f), holding that First Biotech evaded the antidumping duty ("ADD") order on xanthan gum from the People's Republic of China ("China" or "PRC"). *Xanthan Gum from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 78 Fed. Reg. 43,143 (July 19, 2013) ("ADD Order"). The RR Determination affirmed CBP's Trade Remedy & Law Enforcement Directorate ("TRLED") Notice of Determination as to Evasion issued under 19 U.S.C. § 1517(c). TRLED Notice of Determination as to Evasion (Feb. 26, 2026), CR 88, PR 226 ("TRLED Determination"); RR Final Administrative Review Decision (July 7, 2026), CR 92, PR 243 ("RR Determination"). The RR Determination stated that "to the extent that any findings or conclusions made herein as to the proper appraisement of merchandise or otherwise are inconsistent with TRLED's findings or any instructions previously given by TRLED, this decision supersedes those findings and/or instructions." RR Determination at 31-32, CR 92.

---

[1] "CR __" refers to the document number in the Confidential Administrative Record; "PR __" refers to the document number in the Public Administrative Record. Citations to specific pages are to the confidential version unless only a public version exists.

### B. Reasons for Contesting the Administrative Decisions

First Biotech's reasons for contesting the administrative decisions are set forth in the Summary of Arguments below, and in more detail in the Argument section of this Memorandum.

### C. Issues Presented

1. *Whether CBP unlawfully determined that xanthan gum produced by Neimenggu Fufeng in China was entered into the United States by First Biotech through evasion because there was no bona fide sale between Neimenggu Fufeng and First Biotech*?

**Answer: YES.** In its determination, CBP (1) relied on a legally incorrect definition of the term sale to analyze the transactions between Neimenggu Fufeng and First Biotech; (2) did not rely on substantial evidence in support of its determination that there was no *bona fide* sale, but instead relied on late payment—a legally irrelevant factor—as the linchpin of its conclusion; (3) treated First Biotech differently than it treated another party to the investigation, Deosen USA; (4) rejected First Biotech's claim that late payment is a common commercial practice because of an absence of evidence, notwithstanding that the record had closed before the late payment issue arose; and (5) rejected, without analysis, First Biotech's all-costs-plus-a-profit test ("ACPPT") claim.

2. *Whether CBP lawfully determined that the transaction value of xanthan gum produced by Neimenggu Fufeng in China and entered into the United States by First Biotech who resold the xanthan gum to its unaffiliated customers in the United States could be based on First Biotech's resale price*?

**Answer: NO.** CBP Headquarters' RR Determination is unsupported by substantial evidence and contrary to law since these resale transactions are not sales for exportation to the United States. This issue is not ripe for determination unless and until this Court decides that the Neimenggu Fufeng-to-First Biotech's sale price does not support transaction value.

## II. PRELIMINARY STATEMENT

First Biotech purchases xanthan gum from its affiliate, Neimenggu Fufeng, located in

China. CBP found that First Biotech evaded the ADD Order when it entered xanthan gum at declared entered values that CBP deemed false because, according to CBP, the transactions between the two companies were not *bona fide* sales. RR Determination at 15, 18, 31, CR 92. CBP reached that conclusion not because the transactions lacked any hallmarks of a sale, but because First Biotech's payments to Neimenggu Fufeng were late according to the terms of payment between the parties, and First Biotech was not charged interest or penalized. *Id*. at 15-18. CBP treated this commercial practice as decisive, elevated it over every other indicator of a sale, and on that basis rejected transaction value and found evasion. *Id*. at 16-18.

A sale, as the Federal Circuit and its predecessor court have long held, is a transfer of property from one party to another for consideration. *J.L. Wood v. United States,* 505 F.2d 1400, 1406 (1974); *VWP of America, Inc. v. United States,* 175 F.3d 1327, 1399 (Fed. Cir. 1999). This relevant inquiry is tested by objective indicia such as the assumption of title and risk of loss, documentation between the seller and buyer-reseller, and corporate books and records. *VWP*, 175 F.3d at 1339 (sales occurred where the seller issued invoices, the buyer paid against them, the transactions were recorded in both companies' books as sales, and title passed under the terms of sale in consideration of the buyer's promise to pay); *J.L. Wood*, 505 F.2d at 1406 (a sale is a transfer of property from one party to another for consideration, established where "ownership of the imported merchandise was transferred . . . for a valuable consideration"). Whether related parties deal at arm's length, whether one controls the other, and whether interest is being charged when actual payments do not conform to sales terms are not elements of whether goods have been sold; these factors relate to the independent question of whether a related-party sale price may be used as transaction value under 19 U.S.C. § 1401a(b)(2). By focusing solely on when payment was made and inserting an arm's-length inquiry into the threshold question of whether a

sale occurred, CBP applied the wrong legal test.

The record confirms that virtually every traditional indicator of a *bona fide* sale was present in the Neimenggu Fufeng and First Biotech transactions. CBP did not question these facts. These parties transact business under written contracts, purchase orders, and commercial invoices; First Biotech pays Neimenggu Fufeng for the merchandise; title and risk of loss pass to First Biotech under applicable [ ] Incoterms; First Biotech then resells the goods to its unaffiliated customers at [ ] prices. First Biotech takes ownership, holds inventory in its name for a substantial number of sales, bears commercial risks associated with buying merchandise in its own name, resells the merchandise to unaffiliated U.S. customers, records the purchases and resales on its own books, receives payment from its U.S. customers, which can be traced directly to its invoices, deposits payment in its own account, and pays U.S. income tax on its profits, which are substantial and vary from sale to sale. These facts are not at issue. CBP ignored them. Instead, CBP found that the existence of late payments in some transactions, without penalty or interest, was sufficient reason to conclude that a sale did not exist.

Because a reviewing court must judge an agency's action solely on the grounds the agency invoked, and may not sustain it on any other basis, the validity of CBP's determination depends on the rationale in the RR Determination.[2] CBP's late payment rationale does not negate the existence of a sale. Late payment does not undo the passage of title, the assumption of risk of loss, the ownership of inventory, and documentation confirming that goods have been purchased

---

[2] *See Jinko Solar Imp. & Exp. Co. v. United States*, 701 F. Supp. 3d 1367, 1380 (CIT 2024) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)); *Ad Hoc Shrimp Trade Enf't Comm. v. United States,* 578 F. Supp. 3d 1310, 1320 (CIT 2022) ("A court will uphold an agency action when the explanation is of less-than-ideal clarity; however, the explanation must come from the agency, not counsel's post hoc rationalization of agency action" (emphasis in original)).

by an importer and resold by the importer for its own account.

Moreover, for Deosen USA, another party to the EAPA investigation, CBP found that materially indistinguishable transactions with its affiliated Chinese producer, Deosen Ordos, were *bona fide* sales. The sole difference between the transactions of First Biotech and Deosen USA was that First Biotech was not penalized for failing to pay for the goods in a timely manner as set forth in the terms of payment. This difference should not lead to a different result.

CBP compounded its legal error, and its failure to consider critical facts, by changing the linchpin of its decision after the administrative record had closed. Neither the allegation, nor the notice of initiation, nor any request for information suggested that the existence of a sale between First Biotech and Neimenggu Fufeng would rise or fall on whether payment was timely and interest was charged if it were not. First Biotech was then faulted by CBP for "fail{ing} to provide any examples or support" for its response on late payments, when the record had closed before First Biotech had any reason to realize the issue would be dispositive of CBP's determination. RR Determination at 17, CR 92. An agency decision issued in this manner should not be affirmed.

Finally, CBP rejected First Biotech's reliance on the ACPPT for purposes of validating transaction value. *Id*. at 29-30. First Biotech submitted a third-party profitability analysis demonstrating that Neimenggu Fufeng's operating profit margin on its U.S. sales exceeded the parent's overall margin and CBP accepted those figures. First Biotech Written Arguments (Dec. 16, 2025), CR 80, PR 212 ("FB Written Argument"), Sec. III & Exhs. 0B-1–0B-3. First Biotech showed that CBP has a longstanding practice of relying on this test. *Id*. at 5-6 & nn.4-9. Rather than reviewing the test results, CBP declined to consider First Biotech's analysis on the grounds that late payment negated the possibility that the test results were accurate. RR Determination at

29-30, CR 92. CBP's summary rejection of First Biotech's ACPPT analysis was an abuse of discretion and contrary to law.

For each of these reasons, CBP's determination is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, contrary to the valuation statute and its implementing regulations, and contrary to controlling judicial precedent and CBP's own administrative practice. First Biotech respectfully requests that this Court hold the determination unlawful and remand this matter to CBP with instructions to issue a determination consistent with this Court's instructions.

## III. JURISDICTION

First Biotech asks this Court to review CBP's determination that First Biotech entered merchandise covered by the ADD Order through evasion. This Court has jurisdiction pursuant to section 517(g) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1517(g), and 28 U.S.C. § 1581(c). EAPA directs this Court to determine whether a determination issued pursuant to 19 U.S.C. § 1517(c) or an administrative review issued pursuant to 19 U.S.C. § 1517(f) was "conducted in accordance with those subsections." 19 U.S.C. § 1517(g)(2). In so doing, this Court "shall examine . . . whether {CBP} fully complied with all procedures under subsections (c) and (f)" and "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.*; *Leco Supply, Inc. v. United States*, 619 F. Supp. 3d 1287, 1292 (CIT 2023).

## IV. STANDARD OF REVIEW

The standard of judicial review for EAPA determinations is set forth in 19 U.S.C. § 1517(g)(2). This Court will hold unlawful "any determination, finding, or conclusion {that} is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1517(g)(2). The standard of review for international trade cases also encompasses the standards

established under the Administrative Procedure Act, 5 U.S.C. § 706(2). *Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012) ("We review Commerce's decision under the Administrative Procedure Act and any other applicable law.") (quoting *SKF USA Inc. v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2001)).

In *Loper Bright Enterprises. v. Raimondo*, 603 U.S. 369, 413 (2024), the Supreme Court held that "{c}ourts need not . . . defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright* forecloses this Court from affirming CBP's decision merely because the government's statutory interpretation is reasonable. *Id.* at 397-400, 413. *Loper Bright* clarified that it "makes no sense to speak of a 'permissible' interpretation that is not the one the court, after applying all relevant interpretive tools, concludes is best. In the business of statutory interpretation, if it is not the best, it is not permissible." *Id.* at 400.

The *Loper Bright* standard of review applies to this case. This Court's rationale in *Ventura Coastal, LLC v. United States*, that "{t}he statute contains no indication that Congress expressly delegated to Commerce the authority to give meaning to the word 'partners'" applies to the term "the price actually paid or payable when sold for exportation to the United States." 736 F. Supp. 3d 1342, 1357-58 (CIT 2024); *see Loper Bright*, 603 U.S. at 394-95; 19 U.S.C. § 1401a(b)(1). "The statute contains no open-ended terms that would give flexibility to the agency." *Ventura Coastal*, 736 F. Supp. 3d at 1357. "*Loper Bright* does not suggest that Commerce's authority to issue regulations to implement the statute…is a delegation of authority to give meaning to statutory terms. . . . Under this theory Commerce . . . {and in this case CBP} . . . would have the power to give meaning to every statutory term rendering *Loper Bright* meaningless." *Id.* at 1357-58. Thus, in the same manner as *Ventura Coastal* reasoned that "the Court must give meaning to the word 'partners' in 19 U.S.C. § 1677(33)(C)," this Court

must give meaning to the word "sold" in 19 U.S.C. § 1401a(b)(1).

Moreover, an agency "must examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In its review of an agency's explanation, the "court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* "An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represent an unreasonable judgment in weighing relevant factors . . . ." *WelCom Prods., Inc. v. United States*, 865 F. Supp. 2d 1340, 1344 (CIT 2012) (citation omitted).

"{C}ourts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998). CBP must "cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs.*, 463 U.S. at 48. CBP is obligated to "articulate a rational connection between the facts found and the choice made." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974).

Finally, "when review of an agency's action is 'bound up with a record-based factual conclusion,' the reviewing court must determine whether that conclusion 'is supported by substantial evidence.'" *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 63 (D.D.C. 2016) (quoting *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999)). When a reviewing court is "tasked with reviewing a decision based on an agency record, and that record does not support the contested decision, the court must remand for further proceedings." *Royal Brush Mfg., Inc. v. United States*, 483 F. Supp. 3d 1294, 1304 (CIT 2020), *vacated and remanded on other grounds*,

*Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250 (Fed. Cir. 2023).

## V. STATEMENT OF FACTS

### A. The ADD Order and Commerce's Administrative Reviews

On July 19, 2013, the U.S. Department of Commerce ("Commerce") published the ADD Order, 78 Fed. Reg. 43,143. The ADD Order was assigned case number A-570-985. *Id.* Neimenggu Fufeng was provisionally excluded from the ADD Order and later reinstated. *Xanthan Gum from the People's Republic of China: Notice of Third Amended Final Determination*, 85 Fed. Reg. 40,967 (July 8, 2020).

From February 6, 2024, through May 26, 2025, First Biotech's ADD cash deposit rate on entries of xanthan gum exported by Neimenggu Fufeng was 2.9 percent of entered value. *Xanthan Gum from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Partial Rescission of the Antidumping Duty Administrative Review, and Final Determination of No Shipments; 2021-2022*, 89 Fed. Reg. 8,165 (Feb. 6, 2024). In the tenth administrative review ("AR10") covering the period of review ("POR") July 1, 2022, through June 30, 2023, Commerce found that Neimenggu Fufeng's dumping rate was zero percent. *Xanthan Gum from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments*, 90 Fed. Reg. 22,240, 22,242 (May 27, 2025) ("*AR10 Final Results*"). Because all of Neimenggu Fufeng's AR10 sales were to First Biotech, a related company, Commerce calculated the margin using the constructed export price ("CEP") methodology, comparing First Biotech's resale prices to unaffiliated U.S. customers with normal value. FB Written Argument at 1, 10 & n.10, CR 80; First Biotech Updated Request for Administrative Review, CR 90 ("FB Review Request") at 4; 19 U.S.C. § 1677a(b). Thus, Neimenggu Fufeng's sale price to First Biotech affects the ADD cash deposit rate, but does not directly impact Commerce's dumping margin calculation methodology.

Effective May 27, 2025, and continuing through July 15, 2026, First Biotech's cash deposit rate was zero percent. *AR10 Final Results*, 90 Fed. Reg. at 22,242.

On July 16, 2026, Commerce published the Final Results of the eleventh administrative review ("AR11") of the ADD Order, covering the POR July 1, 2023, through June 30, 2024, and assigned Neimenggu Fufeng a dumping rate of 38.76 percent. *Xanthan Gum from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2023-2024*, 91 Fed. Reg. 43,610 (July 16, 2026) ("*AR11 Final Results*"). That rate reflects Commerce's decision that Neimenggu Fufeng was not selling xanthan gum at dumped prices during the first nine months of AR11, in which Commerce's determination was based on Neimenggu Fufeng data, but that Neimenggu Fufeng's rate for the final three months was 154.07 percent, based on total adverse facts available ("AFA"). *AR11 Final Results*, 91 Fed. Reg. 43,610, accompanying Issues and Decision Memorandum ("IDM") Comment 10 (July 16, 2026).[3] Commerce applied total AFA because CBP had issued an affirmative finding of evasion, on July 7, 2026, which led Commerce to conclude that First Biotech had submitted false information to Commerce as to entered value. *Id.* In this case, First Biotech is challenging CBP's determination that its transactions with Neimenggu Fufeng are not sales. In a separate appeal pending before this Court, First Biotech is challenging Commerce's decision to rely on "total AFA." *Neimenggu Fufeng v. United States*, Court No. 26-03423, Complaint (July 29, 2026), ECF 6, at 14-20. These two civil actions are inextricably intertwined.

[3] Commerce reasoned: "CBP's determination that the entered value of merchandise did not reflect United States customs values applies only to sales made of entries into the customs territory of the Unites States during the inquiry period examined in EAPA 8144, April 4, 2024, through July 3, 2025." *AR11 Final Results*, 91 Fed. Reg. 43,610, IDM Comment 10.

**B. <u>Plaintiff</u>**

First Biotech is a California corporation located in Anaheim, California, and is the U.S. importer of record of the subject xanthan gum. It is ultimately owned by Fufeng Group Limited, a company listed on the Hong Kong Stock Exchange (546:HK). Neimenggu Fufeng is First Biotech's affiliated Chinese producer and exporter. The two are sister companies under common ultimate ownership of Fufeng Group Limited. First Biotech RFI Response (Sep. 17, 2025), CR 30, PR 125 ("FB RFI Response"), at 6.

**C. <u>The Transactions Between Neimenggu Fufeng and First Biotech</u>**

Neimenggu Fufeng manufactures xanthan gum in China and sells it to First Biotech, which imports the merchandise and resells it to unaffiliated U.S. customers. FB RFI Response at 6, CR 30. The merchandise moves through two channels: (1) shipments delivered directly from China to First Biotech's unaffiliated U.S. customers; and (2) shipments held by First Biotech in U.S. warehouse inventory prior to shipment to First Biotech's customers. TRLED Determination at 19, CR 88. During AR11, [ ] of [ ] U.S. sale observations reported by Neimenggu Fufeng in its Section C questionnaire response consisted of warehoused inventory. TRLED Memorandum adding Commerce information re: First Biotech and Neimenggu Fufeng, CR 75, PR 200 ("CBP Memo"), Attachment 2; TRLED Determination at 19, CR 88.

Neimenggu Fufeng sells to First Biotech pursuant to written sales contracts, purchase orders, and commercial invoices, and First Biotech pays Neimenggu Fufeng for the merchandise by bank transfer. *See* FB RFI Response Part III, Exhs. 11-1–11-5, CR 30. Payments generally are made on a lump-sum basis covering multiple invoices, and First Biotech reconciles each purchase to a Neimenggu Fufeng invoice. *Id.*

Title and risk of loss pass from Neimenggu Fufeng to First Biotech upon loading of the vessels in China under [ ] terms, and First Biotech retains title and risk of loss until the

xanthan gum is delivered to or picked up by its U.S. customers. FB RFI Response at 26, CR 30. First Biotech resells to its unaffiliated U.S. customers on [ ] terms. FB Review Request at 8-9, CR 90.

First Biotech maintains its own U.S. office and employs its own United States personnel, who perform logistics, invoicing, billing, collections, sales and customer support, and administrative functions, and who control First Biotech's books, ledgers, and records. FB RFI Response at 2-3, 8, 14-15; Exh. 1-1, CR 30. First Biotech's general manager participated in price negotiations with unaffiliated U.S. customers. *See*, *e.g.*, FB RFI Response Part III, Exh. 11 at pdf pages 3380, 3529, CR 30; FB Review Request at 10 & n.30, CR 90.

First Biotech records its purchases from Neimenggu Fufeng in [ ] Desktop as inventory assets and accounts payable and records its resales to U.S. customers as accounts receivable and sales revenue, with a simultaneous entry to cost of goods sold and a corresponding reduction of inventory. *See* FB RFI Response at 14-15, Part II, Exhs. 8c & 2b-1A, CR 30; FB Review Request at 11, CR 90. Those entries are carried to First Biotech's general ledger, trial balance, and financial statements. *Id.* First Biotech deposits the proceeds of its resales, which are paid to First Biotech by its unaffiliated customers, into its own U.S. bank account in its own name and pays U.S. income tax on its U.S. profits. *Id.*; FB RFI Response Part II, Exhs. 2g-1A, 2g-1B, CR 30.

For the five entries CBP selected for extensive examination, Neimenggu Fufeng's profit ratio on its sales to First Biotech and First Biotech's profit ratio on its resales to unaffiliated U.S. customers are as follows:

| SN | Entry No. | NMFF Invoice No. | NMFF Profit Ratio | First Biotech Invoice No. | First Biotech Profit Ratio |
|---|---|---|---|---|---|
| 1 | [ ]7208 | [ ] | [ ]% | [ ] | [ ]% |
| 2 | [ ]9826 | [ ] | [ ]% | [ ] | [ ]% |

| SN | Entry No. | NMFF Invoice No. | NMFF Profit Ratio | First Biotech Invoice No. | First Biotech Profit Ratio |
|---|---|---|---|---|---|
| 3 | [ ]0690 | [ ] | [ ]% | [ ] | [ ]% |
| 4 | [ ]4936 | [ ] | [ ]% | [ ] | [ ]% |
| 5 | [ ]7718 | [ ] | [ ]% | [ ] | [ ]% |

FB Written Argument at 6-8, 11-12, App. I, App. II, CR 80.

A profitability analysis prepared by a third party showed that in 2024, Neimenggu Fufeng realized an operating profit margin of [ ] percent on sales of xanthan gum to the U.S. market, while the [ ] realized an overall operating profit margin of [ ] percent on worldwide xanthan gum sales. *Id*. at 6. The report also showed that the weighted average operating profit margin of the [ ] companies that sold xanthan gum was [ ] percent xanthan gum from China. *Id.*

**D. <u>CP Kelco's Allegation and the Initiation of EAPA Consol. Case 8144</u>**

On March 27, 2025, CP Kelco U.S., Inc. ("CP Kelco"), a domestic producer, filed an "Allegation of Evasion of Antidumping Duty Order via Undervaluation against First Biotech Inc. and its Affiliates." CP Kelco EAPA Allegation Against First Biotech (Mar. 27, 2025), PR 2 ("Allegation"); RR Determination at 2, CR 92. The Allegation compared the average unit value ("AUV") of First Biotech's imports of Chinese xanthan gum from January through September 2024, $3.07 per kilogram derived from public data, to the AUVs of xanthan gum imported from Austria ($9.03 to $11.00 per kilogram) and to CP Kelco's own imports of xanthan gum from China ($5.81 to $11.29 per kilogram). Allegation at 6, 8-11 & Attachs. 18, 20, 25, PR 2. CP Kelco submitted an affidavit stating that even the poorest quality xanthan gum should be valued no lower than approximately one half of the price of standard xanthan gum. *Id*. Attach. 18; TRLED Initiation Memorandum (First Biotech) (Apr. 25, 2025), CR 8, PR 21 ("Initiation Memo"), at 4.

TRLED acknowledged receipt of the Allegation on April 4, 2025. RR Determination at 2, CR 92. TRLED initiated the investigation on April 25, 2025, finding that CP Kelco's allegation "reasonably suggests that First Biotech imported merchandise covered by the Order into the customs territory of the United States through evasion by undervaluing the merchandise in question." Initiation Memo at 4, CR 8. TRLED consolidated the EAPA investigations of ADD Order evasion by First Biotech and other importers, Deosen USA and Jianlong USA. TRLED Notice of Investigation and Interim Measures (July 31, 2025), CR 17, PR 46 ("NOI") at 11.

On July 2, 2025, TRLED placed on the record data showing the quantity, value, and AUV of xanthan gum imported into the United States from France in 2024. TRLED Memorandum with Data for U.S. Xanthan Gum Imports from France, PR 30.

On July 31, 2025, TRLED issued its Notice of Initiation of Investigation and Interim Measures, covering unliquidated entries of covered merchandise entered on and after April 4, 2024, through the pendency of the investigation. RR Determination at 4, CR 92; NOI at 2, CR 17. TRLED did not impose interim measures on First Biotech, noting that it had provided "at least some information and documentation" in support of its claim that its purchase price was sufficient for the seller to recover its costs. NOI at 10, CR 17. The Allegation and the NOI addressed the entered values that First Biotech declared. Allegation, PR 2; NOI, CR 17. Neither document discussed whether the transactions between Neimenggu Fufeng and First Biotech constituted sales.

**E. <u>Development of the Administrative Record</u>**

CBP issued CF-28 Requests for Information on May 13, 2025. First Biotech submitted its CF-28 responses on July 11, 2025, which TRLED described as complete. RR Determination at 3, CR 92; CEE CF-28 for First Biotech (May 13, 2025), CR 12, PR 25; CEE CF-28 for First Biotech (May 13, 2025), CR 13, PR 26; First Biotech CF-28 Response Resubmitted (entry

ending 7208) (July 11, 2025), CR 26, PR 95 ("FB CF-28 Response 7208"), at 1-13; First Biotech CF-28 Response Resubmitted, CR 27, PR 96 (entry ending 9826) (July 11, 2025), ("FB CF-28 Response 9826"), at 1-14.

TRLED issued RFIs on August 12 and 13, 2025, to First Biotech and Neimenggu Fufeng, respectively. TRLED RFI for First Biotech, CR 19, PR 58; TRLED RFI for Neimenggu Fufeng (Aug. 13, 2025), CR 23, PR 69. First Biotech responded on September 17, 2025, and resubmitted certain portions on October 6, 2025. FB RFI Response at 1-27, CR 30; First Biotech Resubmission of Portions of RFI Response (Oct. 6, 2025), CR 51, PR 154, at 1-27. Neimenggu Fufeng submitted an RFI response on September 22, 2025, that was resubmitted in its entirety on October 2, 2025. Neimenggu Fufeng Resubmission of RFI Response (Oct. 2, 2025), CR 50, PR 150, at 1-31.

TRLED issued Supplemental Requests for Information ("SRFI") on October 21, 2025. TRLED Supplemental RFI for First Biotech (Oct. 21, 2025), CR 57, PR 167 ("TRLED Supp RFI for First Biotech"); TRLED Supplemental RFI for Neimenggu Fufeng (Oct. 21, 2025), CR 60, PR 170. Neimenggu Fufeng responded on November 5, 2025. Neimenggu Fufeng Supplemental RFI Response (Nov. 5, 2025), CR 69, PR 196, at 1-10. First Biotech responded on November 6, 2025. First Biotech Supplemental RFI Response (Nov. 6, 2025), CR 73, PR 198 ("FB SRFI Response"), at 1-16.

On November 12, 2025, TRLED placed on the record documentation from Commerce's administrative review proceedings for AR10 and AR11, including Commerce's on-site verification reports of Neimenggu Fufeng and First Biotech in AR10. CBP Memo, CR 75. TRLED also placed on the record internet search results concerning Neimenggu Fufeng's and First Biotech's facilities. TRLED Memorandum to the File Adding Various Information re: First

Biotech and Neimenggu Fufeng, PR 201 ("TRLED Memo"). November 12, 2025, was the final date on which parties were allowed to submit new factual information on the EAPA record. 19 C.F.R. § 165.23(c)(2)(i).

On December 16, 2025, CP Kelco and First Biotech filed written arguments under 19 C.F.R. § 165.26. FB Written Argument, CR 80; CP Kelco Written Arguments re: First Biotech and Neimenggu Fufeng (Dec. 16, 2025), CR 77, PR 209 ("CP Kelco Written Argument"). CP Kelco's written argument asserted, for the first time in this proceeding, that the transactions between Neimenggu Fufeng and First Biotech were not *bona fide* sales. CP Kelco Written Argument at 2, CR 77. First Biotech and CP Kelco thereafter filed rebuttal arguments. First Biotech Rebuttal Argument (Jan. 7, 2026), CR 82, PR 218; CP Kelco ReFiling of Response to First Biotech Written Argument (Jan. 9, 2026), CR 85, PR 222.

### F. The TRLED Determination

On February 26, 2026, TRLED determined that there was substantial evidence that First Biotech, Jianlong USA (another party to the investigation), and Deosen USA evaded the ADD Order by undervaluing their entries. TRLED Determination at 2, 33-34, 38-39, CR 88. As to First Biotech, TRLED determined that its transactions with Neimenggu Fufeng were not *bona fide* sales, relying on common ownership and shared personnel, the temporary nature of the U.S. warehousing, Neimenggu Fufeng's retention of risk of loss, First Biotech's role as an exclusive distributor, and that payments were not made strictly in accordance with contractual terms. *Id.* at 16-23.

TRLED also reasoned that personnel of [ ], a Neimenggu Fufeng subsidiary, had "negotiated and signed contracts with U.S. customers on behalf of First Biotech since 2015," and that "First Biotech was unable to negotiate the price with the unaffiliated U.S. customers." *Id.* at 16, 17. TRLED identified the individuals involved in

negotiating the prices on the selected entries, including [ ], who served as First Biotech's general manager until [ ], and [ ], who succeeded him. *Id.* at 17. TRLED further found that First Biotech sells only merchandise manufactured by Neimenggu Fufeng, is its exclusive U.S. distributor, and "did not identify any meaningful instructions it provided to Neimenggu Fufeng." *Id.* at 22.

TRLED recalculated the entered value for the five First Biotech entries selected for extensive examination. TRLED did so by determining revenue from sales to unrelated U.S. customers, subtracting allowable exclusions, and deriving a simple average markup of [ ] percent, which it applied to First Biotech's remaining, unexamined entries. *Id.* at 34. TRLED did not disclose the calculations, data inputs, or assumptions underlying that simple average, and did not state how the markup should be applied prospectively. *Id.* Counsel for First Biotech requested clarification of the methodology and of its forward-looking application. FB Review Request at n.1, CR 90. TRLED declined to provide this requested clarification.

**G. <u>CBP Headquarters' RR Determination</u>**

On April 9, 2026, First Biotech requested *de novo* administrative review of the TRLED Determination under 19 U.S.C. § 1517(f) and 19 C.F.R. § 165.41. FB Review Request, CR 90. CBP Headquarters reviewed the record under a *de novo* standard and issued its Final Administrative Review Decision as to Evasion on July 7, 2026. RR Determination, CR 92. CBP stated that transaction value requires a *bona fide* sale, defined as a "transfer of title from one party to another for consideration," that "{n}o single factor is decisive," and that CBP makes the determination "on a case-by-case basis," considering whether the buyer assumed risk of loss, acquired title, and paid for the goods, and whether "the roles of the parties and the circumstances of the transaction indicate that the parties are functioning as buyer and seller." *Id.* at 14-15.

CBP then stated that Neimenggu Fufeng's sales to First Biotech "may appear to meet some of the factors set forth above," and that "sales contracts, purchase orders, and invoices between the parties reflect that title and risk of loss pass from Neimenggu Fufeng to First Biotech under [ ] terms, and that First Biotech retains title and risk of loss until the xanthan gum is delivered to or picked up by First Biotech's customers in the United States." *Id.* at 15, 17. CBP acknowledged that the Incoterms the parties used "may indicate the passage of title." *Id.* at 17. CBP recognized that First Biotech paid Neimenggu Fufeng for the merchandise, noting that certain payments were late. *Id.* at 15-16. CBP found that First Biotech "seldom stored" the xanthan gum in U.S. warehouses. *Id.* at 19.

In light of these subsidiary factual findings, CBP concluded that the record was "insufficient to establish the 'independence of the alleged buyer vis a vis the seller'" because First Biotech's purchases "were not in accordance with the terms outlined in the sales contracts and allowed First Biotech to make late, interest and penalty-free payments." *Id.* at 15. CBP relied on two entries as support for this conclusion. For bill [ ], entry [ ]4936, First Biotech paid for the goods on [ ], past the contractual [ ] term running from the [ ] bill date, without interest or penalty, and the contract contained a clause providing for a [ ] on breach. *Id.* For entry [ ]7208, invoice [ ], in the amount of $[ ], First Biotech paid Neimenggu Fufeng on [ ], approximately [ ] after the [ ] due date, without interest. *Id.* at 15-16. CBP noted that First Biotech's invoice to its unrelated U.S. buyer required payment within [ ] days and imposed [ ] interest after [ ] days. *Id.*

CBP found that these facts "resemble" HQ H343362 (May 6, 2025), and concluded that "the transactions between First Biotech and Neimenggu Fufeng do not constitute *bona fide* sales

due to the late and interest-free payments." RR Determination at 16, CR 92. CBP characterized HQ H343362 as follows: "In HQ H343362, the U.S. importer appeared to be paying itself for the imported merchandise. One division of a company selling merchandise to a separate division of a company does not constitute the 'transfer of title for consideration' required for a *bona fide* sale." *Id.* CBP cited *VWP* for the quoted proposition. *Id.* at 16 n.140.

CBP treated First Biotech's statement that payments were "arranged based on the financial situation and needs of both parties" as support for its conclusion that the parties were not dealing at arm's length, and stated that First Biotech "fail{ed} to provide any examples or support" for its argument that multinational companies commonly extend payment time. *Id.* at 16-17. CBP also stated that First Biotech and Neimenggu Fufeng "do not behave like separate entities between which title may pass." *Id.* at 17.

Having found no *bona fide* sale, CBP held that First Biotech could no longer use its purchase price as the entered value, determined that value to be false, and reasoned that the prices First Biotech charged unrelated U.S. buyers should be used as statutory transaction value. *Id.* at 17-19. CBP "accept{ed}" First Biotech's profitability results "at face value," "assum{ed} arguendo" that the parties met the ACPPT, but held that the test results were immaterial in the absence of a *bona fide* sale due to late payment. *Id.* at 30. CBP also stated that the late payments "lead to questions as to whether the delayed payments affected the profitability calculations." *Id.*

In the same determination, CBP found that the sales from Deosen Ordos to its related U.S. affiliate Deosen USA were *bona fide* sales. *Id.* at 21-22. CBP made this finding, notwithstanding the fact that the individuals who negotiated prices for Deosen USA were employees of Deosen Ordos who engaged in U.S. marketing activities, entered into sales contracts with U.S. buyers on Deosen USA's behalf, and negotiated prices and sales contracts

with Deosen Ordos on Deosen USA's behalf. *Id.* CBP also concluded that Deosen USA "did not appear to exercise much, if any, control over locating U.S. buyers." *Id.* Citing *VWP*, CBP stated that "{t}he fact that Deosen USA's sales team is made up of employees of Deosen Ordos does not nullify the existence of a *bona fide* sale for exportation where a transfer of title for consideration has occurred," and noted that Deosen Ordos "transferred title" and that Deosen USA "provided proof of timely payment." *Id.* CBP found that Deosen USA held title to the imported xanthan gum for some period of time under both its direct-shipment channel and its inventory channel. *Id.* However, CBP then concluded that Deosen Ordos's sale price to Deosen USA could not be used as transaction value because the transactions failed the ACPPT. *Id.* at 23-25.

Accordingly, CBP affirmed TRLED's February 26, 2026, determination of evasion as to both First Biotech and Deosen USA, expressly stating that the rationale in the CBP Headquarters determination supersedes any inconsistent TRLED findings. *Id.* at 31-32.

### H. Judicial Review

First Biotech was a party to EAPA Consolidated Case 8144 and participated in both the investigation and the administrative review. First Biotech commenced this action by filing a Summons and Complaint on July 16, 2026, ECF 1, 6. These documents were timely filed under 19 U.S.C. § 1517(g)(1).

## VI. SUMMARY OF ARGUMENT

CBP found evasion on a single ground: that the transactions between Neimenggu Fufeng and First Biotech were not *bona fide* sales. Every other aspect of CBP's final determination—*i.e.*, rejection of transaction value, finding of a false statement, refusal to apply the ACPPT—depends on that conclusion. This Court reviews the determination on the ground CBP invoked.

*SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). That ground fails for the following reasons.

First, CBP applied the wrong legal standard. A "sale" is a transfer of title for consideration. *VWP*, 175 F.3d at 1339. CBP recited that standard and then decided the case by focusing solely on whether First Biotech paid interest to Neimenggu Fufeng when payment was not made according to agreed-upon payment terms. RR Determination at 14-18, CR 92. Late payment is not a relevant factor in determining whether a transaction constitutes a sale. The statutory term sale is defined based on its common meaning as interpreted by reviewing courts. Whether a related party relationship and late payment negate transaction value is subject to analysis based on multiple, alternative tests, specified in 19 U.S.C. § 1401a(b)(2)(B), and 19 C.F.R. § 152.103(l), which are reached only after a sale, as defined in 19 U.S.C. § 1401a(b)(1), is found to exist.

Second, substantial evidence does not support a finding that the transactions between Neimenggu Fufeng and First Biotech were not sales (the sole basis for CBP's finding of evasion). CBP did not dispute the existence of written sales contracts, purchase orders, and invoices, the passage of title and risk of loss under [ ] terms, First Biotech's U.S. warehouse inventory, its resales to unaffiliated customers in its own name, its books and bank deposits, and its payment of U.S. income tax. RR Determination at 7, 17, CR 92. CBP did not find that payment was not made to Neimenggu Fufeng or that payment could not be traced to the merchandise it covered. CBP relied instead on late, interest-free payment on two entries. *Id.* at 15-16. Late payment gives a seller a claim against the buyer. It does not undo the transfer of title to goods already delivered, warehoused, and resold. It does not negate the existence of a sale.

Third, CBP found *bona fide* sales between Deosen Ordos and Deosen USA despite shared negotiating personnel and parental control over U.S. sales activity, holding that those

facts do "not nullify the existence of a *bona fide* sale for exportation where a transfer of title for consideration has occurred." *Id.* at 22. Proof of timely payment was the sole reason why CBP decided that the Deosen USA transactions constituted sales and the First Biotech transactions did not. CBP's disparate treatment of First Biotech and Deosen USA merely because First Biotech made late payments and Deosen USA did not is contrary to law. Because it treats similar situations differently without adequate explanation, CBP's determination is arbitrary. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

Fourth, the investigation was noticed and conducted as an undervaluation case. CP Kelco's and CBP's *bona fide* sale theory first emerged in written argument after the factual record closed. *See* 19 C.F.R. § 165.23(c)(2)(i); CP Kelco Written Argument at 2, CR 77. CBP rejected First Biotech's claim that late payment is a common commercial practice because of an absence of evidence notwithstanding that the record had closed before the late payment issue arose. RR Determination at 17, CR 92. CBP's rationale for rejecting First Biotech's claim is contrary to law.

Fifth, CBP accepted First Biotech's ACPPT figures at face value, but declined to find that First Biotech had satisfied this test because it had already found no sale and because, in CBP's opinion, late payment skews the test results. RR Determination at 30, CR 92. Because the record had closed before First Biotech was aware of the weight CBP would give this circumstance, CBP denied First Biotech a fair opportunity to address the issue. CBP's refusal to consider First Biotech's evidence is contrary to law.

Finally, CBP Headquarters decided, with minimal analysis, that First Biotech's imports should be appraised under transaction value at the price First Biotech resold the xanthan gum to its unaffiliated customers in the United States. TRLED Determination at 33-35, CR 88; RR

Determination at 18-19, CR 92. This alternative basis of appraisement was expressly raised by CBP Headquarters in its review of the TRLED determination. TRLED Determination at 33-35, CR 88. CBP Headquarters' RR Determination is unsupported by substantial evidence and contrary to law since these resale transactions are domestic sales and are not sales for exportation to the United States.

For these reasons, the determination should be held unlawful and remanded with instructions to issue a determination consistent with this Court's instructions.

## VII. <u>ARGUMENT</u>

### A. <u>The Governing Legal Standard</u>

#### 1. <u>Relationship and control are not relevant factors in determining whether transactions are sales</u>

Whether transactions between Neimenggu Fufeng and First Biotech are "sales" under § 1401a(b)(1) is a question of statutory interpretation that this Court decides independently, without deference to CBP's analysis. *See Loper Bright*, 603 U.S. at 412-13; Section III, *supra*. CBP ruling letters may be consulted for their reasoning but do not bind this Court's construction of the statute. *See United States v. Mead Corp.*, 533 U.S. 218, 234-35 (2001).

Transaction value is the preferred method of appraising imported merchandise, defined as "the price actually paid or payable for the merchandise when sold for exportation to the United States," plus certain statutory adjustments. 19 U.S.C. § 1401a(a)(1), (b)(1). When applied to related parties, the statute poses two distinct questions, in sequence:

1. Whether a transaction is a sale; and
2. Whether the transaction value derived from that sales price is acceptable notwithstanding the relationship.

*Id.* § 1401a(b)(2); *see VWP*, 175 F.3d at 1338.

The answer to the first question does not depend on the answer to the second. The relationship between the parties is not relevant in determining whether a *bona fide* sale exists. Congress addressed the concern that a relationship might influence the price by requiring CBP to conduct a separate inquiry after a sale is found to exist. While transaction value between related parties may not be used where the relationship "influenced the price actually paid or payable," 19 U.S.C. § 1401a(b)(2)(A)(iv), even then transaction value "is acceptable" if the circumstances of the sale show that the relationship did not influence the price, or if the value closely approximates specified test values, *id.* § 1401a(b)(2)(B). Section 1401a(b)(2)(A)(iv) withholds transaction value where "the buyer and seller are related persons and the transaction value is not acceptable." Relatedness, therefore, is a question that arises after a sale is found, not a question of whether a sale occurred. Whether the parties dealt at arm's length, and whether one was independent of or controlled by the other, is the subject of this second inquiry.

*VWP* is directly controlling on this point; its holding confirms that a close relationship between the parties does not, by itself, prevent their transactions from qualifying as sales under § 1401a(b)(1). There, this Court held that the foreign producer and its U.S. affiliate were "one and the same," and on that basis declined to treat their transactions as sales. 175 F.3d at 1337-38 (citing *VWP of America, Inc. v. United States*, 980 F. Supp. 1280, 1286 (CIT 1997)). In this case, CBP reached the identical conclusion in nearly identical words, finding that First Biotech and Neimenggu Fufeng "do not behave like separate entities between which title may pass." RR Determination at 17, CR 92.

However, in *VWP*, the Federal Circuit vacated and remanded this Court's determination, holding that the transactions were sales that "may serve as the basis for transaction value" so long as they "satisfy the requirements of 19 U.S.C. § 1401a(b)(1)," provided their acceptability

"is established under 19 U.S.C. § 1401a(b)(2)(B)." 175 F.3d at 1338. The Federal Circuit thus placed the parties' relationship in the acceptability inquiry under Section 1401a(b)(2), not in the antecedent subsection as to whether a sale occurred. Relatedness, independence, and control are not elements of a sale. Whether a sale exists turns on the objective indicia set out above (transfer of title, assumption of risk of loss, payment, and whether the parties functioned as buyer and seller). *See Meyer Corp., U.S. v. United States,* 43 F.4th 1325, 1332 (Fed. Cir. 2022) ("The transaction value 'is the price actually paid or payable for the merchandise when sold for exportation to the United States,' plus specified additions. 19 U.S.C. § 1401a(b)(1). To be viable as a basis for valuation, a transaction must meet the requirements of 19 U.S.C. § 1401a(b)(2). . . . The corresponding regulation, 19 C.F.R. § 152.103(l)(1), lists ways for Customs to find that the relationship between the buyer and seller did not influence the price, for example, by finding that 'the price has been settled in a manner consistent with the normal pricing practices of the industry in question,' or that 'the price is adequate to ensure recovery of all costs plus a profit which is equivalent to the firm's overall profit.'").

CBP has applied *VWP* in its rulings. In HQ H310087 (Mar. 18, 2022), CBP found a *bona fide* sale between a related buyer and its parent, and then separately denied transaction value because the importer had not established under 19 U.S.C. § 1401a(b)(2)(B) that the relationship did not influence the price. Thus, CBP has recognized that whether a sale occurred and whether a sales price is acceptable are distinct questions. Moreover, CBP stated the correct rule elsewhere in its RR Determination. Addressing Deosen USA, CBP held that seller-employed sales personnel and near-total parental control do "not nullify the existence of a *bona fide* sale for exportation where a transfer of title for consideration has occurred." RR Determination at 22, CR 92. That is the governing rule that CBP did not apply to First Biotech. Section VII.C, *infra*.

2. Sales are transfers of property for consideration; late payment is not relevant to this definition

There is no explicit definition of the term "sale" or "sold" in the relevant statutory provisions or legislative history. Courts have held that Congress defined the term sale to conform to its ordinary meaning. *J.L. Wood v. United States*, 505 F.2d at 1406; *NSK Ltd. v. United States*, 115 F.3d 965, 974 (Fed. Cir. 1997). The ordinary meaning of "sale" is a "transfer{} of property from one party to another for a consideration." *J.L. Wood*, 505 F.2d at 1406. The Federal Circuit adopted that definition for § 1401a(b)(1) in *VWP*. 175 F.3d at 1338-39. No single factor is decisive; whether investigation was noticed and conducted per a *bona fide* sale occurred is determined case-by-case from the totality of the circumstances, focusing on objective indicia such as whether the buyer assumed risk of loss and acquired title, whether it paid for the goods, and whether the parties functioned as buyer and seller. RR Determination at 14-15 (citing HQ 548239 (June 5, 2003), HQ H322425 (Aug. 15, 2025), CR 92). The same definition governs whether the parties are related or unrelated. Only after CBP decides whether the transaction is a sale does the issue arise whether that sale can be used as the transaction basis of valuation. And in that second determination, there are multiple, alternative methods of establishing whether the price is acceptable as appraised value. One method requires that the parties conduct business as if they were unrelated; other methods do not. *See* 19 C.F.R. § 152.103(l)(1)-(2).

The statutory definition of "price actually paid or payable" expressly contemplates deferred payment. It defines the term as the total payment "made, or to be made," for the imported merchandise. 19 U.S.C. § 1401a(b)(4)(A). A sale does not stop being a sale merely because payment trails delivery. *See* 19 C.F.R. § 152.103(a)(1) ("The word 'payable' refers to a situation in which the price has been agreed upon, but actual payment has not been made at the

time of importation. Payment may be made by letters of credit or negotiable instruments and may be made directly or indirectly.")

The Uniform Commercial Code ("UCC"), Article 2 ("sales") categorizes the failure to pay an agreed upon price as a breach of an already completed transaction, which does not negate the fact that a sale has taken place. UCC Article 2-106(1) provides that a "sale" is "the passing of title . . . for a price," while § 2-401(2) provides that title passes to the buyer "at the time and place at which the seller completes performance with reference to physical delivery of the goods." Thus, a sale takes place independent of payment. Payment and delivery are treated as concurrent conditions (§§ 2-507, 2-511) rather than payment being a precondition to the existence of a sale. The remedy structure confirms this: § 2-703 lists "fails to make a payment due" as a *buyer breach* of an already-existing sale — not as something that means no sale occurred. And § 2-709 gives the seller an "action for the price," which by definition presupposes a completed sale with an unpaid, outstanding price obligation. If nonpayment negated the sale itself, there would be nothing to sue for the price. Thus, an unpaid sale is a breached sale, not a non-sale. Nonpayment gives the seller remedies (reclamation under § 2-702, stoppage in transit under § 2-705, action for price under § 2-709)—it does not retroactively unwind the transfer of title.

Significantly, CBP has relied on *J.L. Wood, VWP*, and UCC definitions in determining whether transactions constitute sales. *See* HQ H283094 (Aug. 15, 2023) ("In *VWP*. . . , 175 F.3d 1327 (Fed. Cir. 1999), the . . . Federal Circuit found that the term 'sold' for purposes of 19 U.S.C. § 1401a(b)(1) means a transfer of title from one party to another for consideration. . . . Additionally, CBP reviews and interprets the terms of the sale consistent with the International Chamber of Commerce's Incoterms and the {UCC}."); HQ 544658 (Mar. 26, 1991) ("In *J.L.*

*Wood* . . . , the U.S. Court of Customs and Patent Appeals defined the term "sale" as the "transfer of property from one party to another for consideration. . . . Similarly, section 2-106(1) of the {UCC} defines a "sale" as "the passing of title from the seller to the buyer for a price".); *see also* HQ H218759 (July 9, 2012); HQ 544659 (July 3, 1991).

In sum, CBP's reliance on late payment and failure to charge interest as the sole reason to negate the existence of a sale constitutes reversible legal error.

**B. <u>CBP Unlawfully Found That the Neimenggu Fufeng to First Biotech Transactions Were Not *Bona Fide* Sales</u>**

1. <u>Neimenggu Fufeng to First Biotech transactions satisfy every element of the *bona fide* sale inquiry</u>

In its determination, CBP itself stated that a *bona fide* sale requires a transfer of title from one party to another for consideration. RR Determination at 14-15, CR 92. In applying this test, CBP considers whether the buyer assumed the risk of loss, acquired title, and paid for the goods, and whether the roles of the parties indicate they functioned as buyer and seller. *Id.* "No single factor is decisive." *Id.* In its determination, CBP did not identify any defect in the critical factors used to determine whether transactions constitute sales.

<u>Title and Risk of Loss</u>: CBP found the parties' documents "reflect that title and risk of loss pass from Neimenggu Fufeng to First Biotech under [ ] terms, and that First Biotech retains title and risk of loss until the xanthan gum is delivered to or picked up by First Biotech's customers in the United States." RR Determination at 17, CR 92; *see* FB RFI Response Part III, Exh. 11, CR 30.

<u>Consideration</u>: CBP did not question the fact that First Biotech made payment to Neimenggu Fufeng and acknowledged that payment did occur, albeit late. RR Determination at 15-16, CR 92; *see* FB RFI Response Part III, Exh. 11, CR 30; FB SRFI Response at 7, 11, CR 73.

Documentation of the Transactions: CBP acknowledged that "First Biotech provided CBP with sales contracts, purchase orders, and invoices between First Biotech and Neimenggu Fufeng." RR Determination at 17, CR 92; *see* FB RFI Response Part III, Exh. 11, CR 30.[4]

Completeness of the Record: CBP recognized that First Biotech "submitted complete CF-28 responses." RR Determination at 3, CR 92. There is no question that all of the documents submitted by First Biotech to CBP are complete and accurate.

General Overview: CBP acknowledged that the sales "may appear to meet some of the factors set forth above." RR Determination at 15, CR 92. CBP then concluded that late payment supersedes all other indicators of a sale. *Id.*

Moreover, as discussed above, the record in this case contains unrebutted substantial evidence that the transactions between Neimenggu Fufeng and First Biotech constitute sales as that term is defined in 19 U.S.C. § 1401a(b)(1). This evidence includes the following facts:

1. Neimenggu Fufeng and First Biotech enter into binding sales agreements;
2. First Biotech pays Neimenggu Fufeng for the merchandise;
3. First Biotech records the transactions in its accounting records as purchases and resales;
4. First Biotech assumes ownership, takes title and bears the associated commercial risks, including risk of loss;
5. First Biotech resells a substantial percentage of goods from warehouses in the United States;
6. First Biotech's resales are in its own name;
7. First Biotech personnel conduct pricing and related negotiations with its customers;

[4] CBP also noted that "the documents do not contain the terms of sale between the parties." RR Determination at 17, CR 92. This omission does not negate the fact that all of the documents traditionally supporting a sales transaction are present in this case.

8. Pricing methodologies based on formulas from Neimenggu Fufeng do not replace negotiation and decision making by First Biotech;

9. First Biotech realizes substantial, sale specific profits on its resales, as distinguished from fixed commissions normally associated with agency agreements; and

10. First Biotech pays U.S. income tax on its U.S. profits.

*See* FB Review Request at 7-13, CR 90.

Having acknowledged the existence of each element of its own test, and faced with a record that contains overwhelming substantial evidence that First Biotech is a buyer and reseller, CBP rested its conclusion on a single fact found nowhere in the *bona fide* sale test. Its stated basis for finding that a sale did not exist was that First Biotech's purchases "were not in accordance with the terms outlined in the sales contracts and allowed First Biotech to make late, interest and penalty-free payments." RR Determination at 15, CR 92.

Accordingly, even assuming that late payment is a relevant consideration as to whether transactions are sales, a review of the entire record in this case, and an evaluation of all facts and circumstances, establishes that CBP's determination that the transactions were not sales was not supported by substantial evidence.

2. <u>Payment timing is not an element of a *bona fide* sale</u>

A sale is "a transfer of property from one party to another for consideration." *J.L. Wood*, 505 F.2d at 1406; *VWP*, 175 F.3d at 1339. The timing of consideration is not an element of that test. Section VII.A.2, *supra*. CBP correctly concluded that First Biotech paid Neimenggu Fufeng for the merchandise, quoting CBP's normal standard for analyzing this factor:

> Evidence to establish that consideration has passed includes payment by check, bank transfer, or payment by any other commercially acceptable means. Payment must be made for the imported merchandise at issue; a general transfer of money from one corporate entity to another, which cannot be linked to a specific import transaction, does not demonstrate passage of consideration.

RR Determination at 15, CR 92.

CBP imposes two requirements regarding payment: (1) must be made by a commercially acceptable means; and (2) must be linked to the specific import transaction. *See* CBP, *What Every Member of the Trade Community Should Know About: Bona Fide Sales and Sales for Exportation to the United States* (Aug. 2005),[5] at 2. CBP concluded that this test was satisfied. CBP found that First Biotech paid Neimenggu Fufeng for the merchandise. RR Determination at 15-16, CR 92. Payments were made by bank transfers and CBP identified the specific invoices they covered, including invoice [ ] in the amount of $[ ] and bill [ ]. *Id.* CBP did not find that any payment was untraceable, or failed to reach Neimenggu Fufeng, or could not be linked to a specific import transaction. What CBP found was that two of five payments selected for extensive examination were made after the dates the sales contracts specified. *Id*. But as previously discussed, the legal standard regarding payment does not require that payment be made by a contractual due date, and it does not require that payment bear interest. Section VII.A.2, *infra*.

The primary administrative ruling upon which CBP relied in its payment timing analysis is not analogous to the facts in this case. In HQ H310087 (Mar. 18, 2022), CBP observed that "{t}he submitted invoices were paid timely." RR Determination at 15 n.124, 16 n.141, CR 92. However, in that case, payment timing was relevant because the parties made payment the condition of title transfer:

> According to the Terms and Conditions, the protestant receives title to the goods upon payment of the invoices to the parent. The submitted invoices were paid timely before the importation of the merchandise into the United States.

---

[5] Available at: https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/ICP-Bona-Fide-Sales-2005-Final.pdf.

HQ H310087.

Where title passes on payment, the date of payment is the date title transfers. In contrast, in this case, title passes under [ ] terms on loading. RR Determination at 17, CR 92. Payment timing in the instant case does not carry the meaning that it does in HQ H310087. That HQ determination otherwise recites the same consideration standard CBP recited here, requiring a commercially acceptable means of payment linked to the merchandise at issue, and does not impose any timing requirement. HQ H310087 (citing HQ 545705 (Jan. 27, 1995)).

CBP also failed to explain the reason why it assigned controlling weight to late payment. CBP stated that whether a *bona fide* sale occurred is determined case-by-case on the totality of the circumstances and that "{n}o single factor is decisive," but concluded that the transactions between First Biotech and Neimenggu Fufeng do not constitute *bona fide* sales based on a single factor, *i.e.*, late and interest-free payments. RR Determination at 14-16, CR 92. CBP did not explain why a single factor, payment timing, outweighed the multiple factors that that need to be analyzed to determine whether a transaction is a sale.

An agency must "articulate a rational connection between the facts found and the choice made." *Bowman Transp.*, 419 U.S. at 285. An agency's action is arbitrary where it "entirely fail{s} to consider an important aspect of the problem" or offers an explanation that "runs counter to the evidence before the agency." *Motor Vehicle Mfrs.*, 463 U.S. at 43. Under 19 U.S.C. § 1517(g)(2), the substantial evidence and arbitrary and capricious inquiries "require an assessment based on a reasonableness standard." *Ad Hoc Shrimp Trade Enf't Comm. v. United States*, 632 F. Supp. 3d 1369, 1374 (CIT 2023). In this EAPA case, CBP announced a totality of circumstances test and made its determination on a single factor that the test does not include. CBP's factual application was not reasonable, resulting in CBP's determination being unlawful.

3. HQ H343362 does not support CBP's test and does not bind this Court

CBP principally relied on HQ H343362 (May 6, 2025), as support for its determination. CBP held that First Biotech's late payments to Neimenggu Fufeng "resemble the facts underlying HQ H343362." RR Determination at 16, CR 92. CBP mischaracterized the parties in this ruling. HQ H343362 concerns three separate legal entities held by a common parent, consisting of a Chinese manufacturer, a Hong Kong middleman, and a U.S. importer. HQ H343362. CBP characterized the ruling as follows: "In HQ H343362, the U.S. importer appeared to be paying itself for the imported merchandise. One division of a company selling merchandise to a separate division of a company does not constitute the 'transfer of title for consideration' required for a *bona fide* sale." RR Determination at 16, CR 92. The ruling, however, contains no such facts or findings. The ruling does not address corporate divisions, does not state that the importer paid itself, and reaches no conclusion of that nature. CBP's citation for the quoted proposition is to *VWP*, not to HQ H343362. RR Determination at 16 n.140, CR 92.

Moreover, the correct legal standard as to whether Neimenggu Fufeng's transfers of property to First Biotech for consideration are "sales" within the meaning of 19 U.S.C. § 1401a(b)(1) is a question of statutory interpretation that this Court resolves independently, without deference to the agency. *Loper Bright*, 603 U.S. at 412-13. Even before *Loper Bright*, a CBP ruling letter merely was "eligible to claim respect according to its persuasiveness." *Mead*, 533 U.S. at 221, 234-35; *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). HQ H343362 earns no such respect here, because it relies on a standard (*i.e.*, late payment and failure to collect interest trump all other factors) that is contrary to law and controlling judicial precedent.

Finally, a CBP Headquarters ruling "represents the official position of the Customs Service with respect to the particular transaction or issue described therein." 19 C.F.R.

§ 177.9(a). Moreover, CBP's regulations limit the precedential effect of a value ruling to the party who requested the ruling and the specific facts described in the request. In contrast with classification rulings, which apply to all articles identical to the article addressed in the ruling request, regardless of importer, a valuation ruling "will be applied only with respect to transactions involving the *same* merchandise and like facts" *Id.* § 177.9(b)(3) (emphasis added). "{N}o other person should rely on the ruling letter or assume that the principles of that ruling will be applied in connection with any transaction other than the one described in the letter." *Id.* § 177.9(c).

In sum, CBP's decision in HQ H343362 is not relevant to this Court's analysis of whether Neimenggu Fufeng's transactions with First Biotech constitute sales.

4. CBP's warehousing analysis does not support its conclusion

In its determination, CBP noted that First Biotech did not store merchandise in its U.S. warehouse for what CBP considered to be a sufficient length of time to support its claims that goods were purchased and resold. RR Determination at 19, CR 92; TRLED Determination at 19, CR 88. There is no dispute of fact here: CBP conceded that some merchandise was warehoused: "When the xanthan gum was stored in warehouses . . . ." RR Determination at 19, CR 92.

First Biotech's sales database from Commerce's AR11 covering sales during the 2023-24 POR shows [ ] of [ ] U.S. sale observations were sales from inventory held in a U.S. warehouse. TRLED Determination at 19 & n.120, CR 88 (citing CBP Memo at Attachment 2, CR 75). That is roughly [ ] percent. CBP nonetheless found that First Biotech "seldom stored" the xanthan gum in U.S. warehouses. RR Determination at 19, CR 92. Over [ ] is not "seldom." CBP's erroneous statement of fact as to the extent of First Biotech's warehousing is another reason why its determination should not be affirmed.

Moreover, First Biotech can link each entry of covered merchandise from Neimenggu Fufeng to a resale invoice with a U.S. customer. Its accounting records book the purchases from Neimenggu Fufeng as inventory assets and the resales to U.S. customers as sales revenue. *See* FB Written Argument at 12 & App. II, CR 80; FB RFI Response at 14-15, CR 30. CBP has found *bona fide* sales where the buyer had no U.S. warehouse and carried no inventory. In the RR Determination, where CBP reviewed Deosen USA, CBP stated:

> CBP {held that there was a *bona fide* sale} despite the fact that VWPA had no U.S. offices or warehouses, carried no inventory, employed only a single employee, had only a post office box and bank account in Maine, and all of its books and records were maintained by its parent company, VWPC, in Canada.

RR Determination at 22 (describing HQ 544745 (Feb. 19, 1992)), CR 92; *see VWP*, 175 F.3d at 1332, 1337.

With respect to Deosen USA, CBP held that shipping straight from the Chinese manufacturer to the U.S. customer does not defeat title or *bona fide* sales:

> Deosen USA purchases Chinese-origin xanthan gum from Deosen Ordos . . . in one of the following two ways: (1) via shipments [
>
> ] . . . ; and (2) via shipments [
> ].
>
> Thus, under *both methods of distribution*, Deosen USA holds title to the imported xanthan gum for some period of time.

RR Determination at 21-22 (emphasis added), CR 92.

CBP cannot apply one standard to Deosen USA and another to First Biotech in the same determination. CBP treated direct shipment as an adverse fact across every First Biotech entry, including the entries CBP acknowledges were warehoused. *Id*. at 19; TRLED Determination at 19-20, CR 88. If a buyer with no warehouse and no inventory can transact *bona fide* sales, warehousing cannot be an element of a *bona fide* sale. To the extent CBP relied on First

Biotech's direct shipments, that reliance contradicts Federal Circuit precedent and CBP's holding as to Deosen USA. *See VWP*, 175 F.3d at 1331-32; RR Determination at 22, CR 92.

### C. **<u>CBP's Determinations as to Deosen USA and First Biotech Are Not Consistent</u>**

It is well established that "an agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF USA Inc.*, 263 F.3d at 1382 (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)). "Commerce is required to provide 'a reasonable explanation for why the statute supports . . . inconsistent interpretations'." *Dongbu Steel Co. v. United States*, 635 F.3d 1363, 1373 (Fed. Cir. 2011); *LA Molisana S.p.A. v. United States,* 138 F.4th 1353, 1361 (Fed. Cir. 2025) ("Because Commerce itself designated protein content as commercially significant and a proxy for pasta quality, it cannot reasonably rely on protein calculation methods that undisputedly inject inaccuracies and characterize those inaccuracies as commercially insignificant."); *Tube Forgings of Am., Inc. v. United States*, 750 F. Supp. 3d 1364, 1381 (CIT 2025) ("This shows Commerce's contradictory practices and magnifies the fact that Commerce treated the same situation differently, without sufficient explanation.").

CBP resolved the First Biotech and Deosen USA administrative review requests in a single determination, on materially similar facts, and reached opposite conclusions on the *bona fide* sale question. RR Determination at 13, CR 92. As to Deosen USA, CBP found that:

1. Deosen USA had almost no control over U.S. sales;

2. "employees of Deosen Ordos engaged in U.S. marketing activities, entered into sales contracts with U.S. buyers on behalf of Deosen USA, and negotiated prices and sales contracts with Deosen Ordos on behalf of Deosen USA;" and

3. "Deosen USA did not appear to exercise much, if any, control over locating U.S. buyers and purchasing xanthan gum from Deosen Ordos."

*Id*. at 22. CBP nonetheless held that these facts do "not nullify the existence of a *bona fide* sale for exportation where a transfer of title for consideration has occurred." *Id*. CBP further relied on *VWP*, in which the Federal Circuit found *bona fide* sales "despite VWPC's near-total control of VWPA." *Id*.

With respect to control, First Biotech's record is stronger than Deosen USA's. The individuals TRLED identified as negotiating prices on the selected entries held office in First Biotech itself: [ ] served as First Biotech's general manager until [ ], and [ ] succeeded him in that role. TRLED Determination at 17, CR 88; FB Review Request at 16 & n.44, CR 90. They acted in that capacity on First Biotech's behalf, coordinating between affiliated entities. FB Review Request at 16, CR 90. In contrast, Deosen USA's negotiations were conducted by employees of the seller, on loan to the importer, with no employment contracts with the importer. TRLED Determination at 28-30, CR 88. If the latter does not defeat a sale, the former cannot.

The asymmetry extends to CBP's ACPPT analysis. CBP found that Deosen USA failed the ACPPT. *See* RR Determination at 23-25, CR 92. In contrast, CBP accepted the profitability figures for First Biotech "**at face value**" and assumed the test was satisfied. *Id*. at 30 (emphasis added). Deosen USA received a *bona fide* sale finding on a record in which it failed the pricing test; First Biotech did not receive that finding on a record in which CBP assumed that the ACPPT was satisfied.

In sum, the different manner in which CBP treated Deosen USA and First Biotech renders its determination contrary to law.

### D. CBP Made the *Bona Fide* Sale Issue Dispositive After the Record Closed

The EAPA investigation was noticed and conducted as an undervaluation case.

Allegation at 1, PR 2; Initiation Memo at 3, CR 8. The ground on which CBP ultimately found evasion, that late and interest-free payments negated the existence of a sale, was never raised while the record was open. CP Kelco's October 1, 2025, rebuttal raised the issue as to who negotiated with U.S. customers and how prices were set; it said nothing about payment timing. CP Kelco Alleger Rebuttal Comments to First Biotech RFI Response (Oct. 1, 2025), CR 48, PR 145, 2-5. The SRFI asked why certain payments did not conform to contract terms, and First Biotech answered, but nothing in CBP's question suggested that First Biotech's answer would be treated as negating a sale. TRLED Supp RFI for First Biotech, Part III(24), CR 57; FB SRFI Response at 7, 11, CR 73.

The record closed on November 12, 2025. 19 C.F.R. § 165.23(c)(2)(i). CP Kelco first argued that the transactions were not *bona fide* sales on December 16, 2025. CP Kelco Written Argument at 2, CR 77. At that time, First Biotech could no longer submit evidence on affiliate payment practices or payment terms in the trade. CBP nonetheless faulted it for "fail{ing} to provide any examples or support" for its position that multinational companies commonly extend payment time. RR Determination at 17, CR 92.

Due process applies to EAPA proceedings. *Royal Brush*, 75 F.4th at 1257-60 (holding that CBP violated an importer's due process rights by relying on information withheld from it, and that the "right to due process does not depend on whether statutes and regulations provide what is required by the constitution"); *see Superior Com. Sols., LLC v. United States*, 811 F. Supp. 3d 1363, 1377 (CIT 2025). What process is due includes notice of the issues to be decided and an opportunity to respond to them. *Rodale Press, Inc. v. FTC*, 407 F.2d 1252, 1256-57 (D.C. Cir. 1968); *see Bowman Transp.*, 419 U.S. at 288 n.4.

The facts in this case are similar to those discussed by this Court in *Jinfu Trading Co. v. United States*:

> Here, . . . plaintiff was first made aware of the prominent role played by certain evidence in Commerce's decision after the record was closed. *See AK Steel Corp.,* . . . 34 F. Supp. 2d at 773 (sustaining Commerce's use of respondent's explanation of data discrepancy as record evidence because respondent "first became aware that reconciliation was in dispute upon receiving a copy of {d}omestic {p}roducers' {c}ase {b}rief"); *Böwe–Passat,* 17 CIT at 343 (remanding matter, and holding that Commerce's refusal to permit respondent to address previously unknown deficiencies in its submissions, made known after record was closed, was a "predatory 'gotcha' policy"). Plaintiff rightly complains that it had no way of knowing that the lack of a reference date would be pivotal to its case. Also, nothing in any of the proceedings had before the draft remand redetermination indicated that the Department would rely so heavily on Customer C's having made early and full payment for the claimed new shipper sale and having loaned Mr. A money to finance a later transaction without the latter having secured CEO B's approval. Therefore, on remand, Commerce is instructed to reopen the record and permit plaintiff to submit new evidence with respect to these matters.

31 CIT 996, 1007-08 (2007).

In sum, CBP must support a finding of evasion by substantial evidence. 19 U.S.C. § 1517(c)(1)(A); 19 C.F.R. § 165.27(a). It cannot meet that burden by relying on a gap in the record that its own procedure created. It cannot base its determination on a "predatory 'gotcha' policy." Accordingly, for this additional reason, CBP's determination was contrary to law.

### E. CBP Did Not Perform the ACPPT Analysis

#### 1. Legal standard

Where the buyer and seller are related, transaction value is acceptable if "an examination of the circumstances of sale indicates that their relationship did not influence the price actually paid or payable," or if the transaction value closely approximates a specified test value. 19 U.S.C. § 1401a(b)(2)(B); 19 C.F.R. § 152.103(j)(2)(i). Those are the two methods of determining the acceptability of transaction value. *VWP*, 175 F.3d at 1335 ("Congress intended the two methods set forth in § 1401a(b)(2)(B) to be the exclusive means of determining the acceptability

of a transaction value between related parties."); RR Determination at 23, 25, 30, CR 92.

Relationship alone is not a ground for rejection. "The Center director shall not disregard a transaction value solely because the buyer and seller are related." 19 C.F.R. § 152.103(l)(1). The regulation then provides for three interpretative notes identifying showings that establish the absence of influence. *Id*. Under Interpretative Note 3, "{i}f it is shown that the price is adequate to ensure recovery of all costs plus a profit which is equivalent to the firm's overall profit realized over a representative period of time (*e.g.*, on an annual basis), in sales of merchandise of the same class or kind, this would demonstrate that the price has not been influenced," *i.e.*, the ACPPT. *Id.* § 152.103(l)(1)(iii).

In applying this test, CBP "normally considers the 'firm's' overall profit to be the profit of the parent company. Thus, if the seller of the imported goods is a subsidiary of the parent company, the price must be adequate to ensure recovery of all the seller's costs plus a profit that is equivalent to the parent company's overall profit." RR Determination at 23 (citing HQ 546998 (Jan. 19, 2000)), CR 92. CBP "usually considers operating profit because it is a more accurate measure of what the company earns on sales once associated expenses have been paid." *Id.* (citing HQ H037375 (Dec. 11, 2009)). Although the regulation does not define "equivalent," CBP's practice is that "if the profit of the seller is equal to or higher on the goods sold for exportation to the United States than the firm's overall profit, the sales price would not be artificially low for customs purposes." *Id.* at 24 (citing HQ H106603 (July 25, 2011)).

2. <u>First Biotech satisfies the test on the figures CBP accepted</u>

First Biotech submitted a profitability analysis prepared by an outside firm. FB CF-28 Response 7208 Exhs. 0B-1-0B-3, CR 26; FB CF-28 Response 9826 Exhs. 0B-1-0B-3, CR 27; FB Written Argument at 6, CR 80. For 2024, Neimenggu Fufeng realized an operating profit

margin of [ ] percent on xanthan gum sales to the U.S. market, compared to a [ ] percent margin realized by Fufeng Group on worldwide xanthan gum sales. FB Written Argument at 6, CR 80. The seller's margin exceeds the parent's margin. Transaction level data for the five entries CBP selected shows that Neimenggu Fufeng realized profits of [ ] to [ ] percent on these sales to First Biotech. *Id*. at 7 & App. I. In four of these entries, Neimenggu Fufeng's profit margin was substantially higher than First Biotech's profit on its resales to unaffiliated customers. Section IV.C, *supra*.

CBP "accept{ed} these results at face value." RR Determination at 30, CR 92. Based on this record, CBP should have concluded that the sales between Neimenggu Fufeng and First Biotech support statutory transaction value. Its failure to do so was contrary to law.

3. <u>CBP declined to reach the test only because of its "no sale" finding</u>

CBP did not decide whether First Biotech satisfied Interpretative Note 3. It accepted the profitability figures at face value, assumed *arguendo* that the test was met, and held that these facts were immaterial because it had found no *bona fide* sale based on late payment. RR Determination at 30, CR 92.

CBP also offered a pretextual "alternative" rationale. It stated that transaction value "is only available to related parties that buy and sell from one another as if they were unrelated," and found the relationship influenced the price based on "interest-free and penalty-free late payments." *Id.* Such reasoning inverts the regulation. Interpretative Note 3 states the legal significance of the ACPPT, which First Biotech satisfies: where the price recovers all costs plus an equivalent profit, "this would demonstrate that the price has not been influenced." 19 C.F.R. § 152.103(l)(1)(iii). The regulation identifies the ACPPT as a demonstration that the relationship did not influence the price.

CBP's "alternative" rationale rests entirely on the timing of payment that cannot support the *bona fide* sale finding for the reasons set out above. Section VII.B.2, *supra*. CBP added that the late payments "lead to questions as to whether the delayed payments affected the profitability calculations." *Id.* This finding was mere speculation. Price comparisons depend on multiple factors, including cost of goods sold, selling, general and administrative expenses ("SG&A"), ocean freight, insurance, and profit. *See* FB Written Argument at 7 & App. I, CR 80. The date of remittance changes none of those inputs and neither the date nor the aggregation of remittances alters an invoice price or a booked cost. An agency must articulate a rational connection between the facts found and the choice made. *Motor Vehicle Mfrs.*, 463 U.S. at 43. "It is well established that speculation does not constitute 'substantial evidence.'" *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009).

4. CBP applied the ACPPT to Deosen USA in the same determination

CBP performed the ACPPT analysis for Deosen USA and found that this company failed the test because Deosen Ordos's overall margin exceeded its margin on sales to Deosen USA. RR Determination at 23-25, CR 92. CBP applied the regulation to one importer and declined to apply it to First Biotech, an importer whose data it had accepted and whose margins satisfy the test. Where an agency offers insufficient reasons for treating similar situations differently, its action is arbitrary. *SKF USA Inc.*, 263 F.3d at 1382.

**F. Transaction Value Cannot Be Based on First Biotech's Domestic Resale Prices to Its Unaffiliated Customers in the United States**

In its final RR Determination, CBP Headquarters decided that transaction value could be based on First Biotech's resales to its unaffiliated customers. CBP reasoned:

> Similar to *VWP of America, Inc.*, in the instant case, the price paid by U.S. buyers to First Biotech represents the "price actually paid or payable for the merchandise" exported to the United States. In fact, an examination of First Biotech and Neimenggu Fufeng's distribution framework reveals shipping orders

> [ ]. . . . Therefore, the sales of Chinese-origin xanthan gum to the U.S. buyers were the sales "for export to the United States" and CBP can appropriately consider these sales to constitute the transaction value of the merchandise.

RR Determination at 19, CR 92.

In *VWP*, the Federal Circuit had reasoned that: "The government is correct that if sales by VWPC to VWPA cannot serve as the basis for transaction value, then transaction value must be based upon sales by VWPA to its U.S. customers. *See* 19 U.S.C. § 1401a(a)(1)(B)." 175 F.3d at 1334. This statement in *VWP* decision was dictum, with no accompanying rationale and no explanation as to why the *VWP* facts supported the Federal Circuit's conclusion. This issue was not raised by the parties to this EAPA investigation. Thus, in the event that this Court concludes that the transactions between Neimenggu Fufeng and First Biotech are not sales or that such sales do not support transaction value, First Biotech asks that this Court allow the parties to submit supplemental briefs on the issue of whether First Biotech's resale transactions to its unaffiliated U.S. customers can be used as the appraised value of First Biotech's imports.

## VIII. <u>CONCLUSION</u>

CBP's finding of evasion followed its *bona fide* sale determination and rises and falls on whether CBP's sales determination is supported by substantial evidence and conforms to law. Because payment was made late in two of five reviewed transactions, CBP decided that none of Neimenggu Fufeng's transactions with First Biotech constituted sales. RR Determination at 15-17, CR 92. Because CBP found that there were no sales, CBP rejected transaction value and declined to consider the ACPPT. *Id.* at 17-19, 30. Because CBP rejected transaction value, CBP concluded that First Biotech's declared entered values were false. *Id.* at 17-19. Because CBP found that the entered values were false, CBP found evasion. *Id.* at 31-32.

This Court must judge the determination "solely by the grounds invoked by the agency."

*Chenery*, 332 U.S. at 196. Therefore, if the Court finds that late payments alone do not constitute sufficient reason to conclude that the transactions between Neimenggu Fufeng and First Biotech were not sales, the Court cannot affirm CBP's determination. And even if this Court finds that late payments justify rejecting transaction value in certain circumstances, there are multiple other reasons why CBP's determination should be remanded for further analysis, as discussed above.

Accordingly, First Biotech respectfully requests that this Court find that CBP's determination is unlawful. This Court should then remand CBP's determination to the agency with instructions to issue a new determination that is consistent with this Court's decision.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

*/s/ Ned H. Marshak*
Ned H. Marshak
Sarah E. Raymond

599 Lexington Ave, 36th Floor
New York, New York 10022
(212) 557-4000

*Counsel for Plaintiff First Biotech Inc.*

Dated: November 6, 2026

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiff's Memorandum of Law In Support of its Motion for Judgment on the Agency Record, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system, is 13,958 words, less than the 14,000-word limit.

*/s/ Ned H. Marshak*
Ned H. Marshak

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

599 Lexington Ave, 36th Floor
New York, New York 10022
(212) 557-4000

*Counsel for Plaintiff First Biotech Inc.*

Dated: November 6, 2026